Jerome BUTLER, Appellant,

v.

**The STATE of Texas, Appellee.**

No. 69734.

Court of Criminal Appeals of Texas, En Banc.

April 5, 1989.

Larry P. Urquhart, court appointed on appeal, Brenham, for appellant.

John B. Holmes, Jr., Dist. Atty., Linda A. West, Jim Buchanan and George Lambright, Asst. Dist. Attys., Houston, Robert Huttash, State's Atty., Austin, for the State.

## OPINION

MILLER, Judge.

Appellant was convicted of capital murder, V.T.C.A. Penal Code, Section 19.-03(a)(2). Death was imposed by the trial court after the jury returned affirmative findings to both special issues submitted pursuant to Art. 37.071(b)(1) and (2) V.A.C. C.P. Direct appeal to this Court was automatic. We will affirm appellant's conviction.

Appellant raises six points of error. In his first point of error, appellant asserts there was insufficient evidence to support the jury's verdict of guilty. Specifically, appellant alleges there was insufficient evidence to demonstrate he committed murder in the course of a robbery, or an attempted robbery, thereby precluding a conviction for capital murder.

The indictment alleged that appellant on or about June 17, 1986, "while in the course of committing and attempting to commit the ROBBERY of NATHAN OAKLEY, hereafter styled the Complainant, intentionally cause[d] the death of the Complainant by shooting the Complainant with a gun." Since appellant asserts insufficiency of the evidence, a detailed recitation of the facts is essential.

The testimony at trial demonstrated that the victim, Nathan Oakley, was sitting in his cab at the Sky Jack Cab Company lot when Louise Walker, the company dispatcher, arrived for work on June 17, 1986, at 3:50 p.m. They exchanged pleasantries and joked about the food Walker had brought to work. A few minutes after 4:00 p.m. Walker put out a call for a fare pickup at the Circle K store on the corner of Blodgett and Scott streets in Houston. To Walker's surprise, Oakley radioed in stating that he would take that fare. She believed he was either still on the lot or had gone home because he usually ended his shift between 3:30 and 3:45 p.m. each day. After dispatching Oakley to the Circle K, Walker never heard from him again.

The State's only eyewitness to the alleged offense was a courier service employee, Lawrence Johnson. Johnson had just made a pick-up at Oak Farm Dairy and was proceeding north, in his van, on Sampson Street at about 4:15 p.m. on June 17, 1986, when he saw a taxicab directly in front of him veer to the left. The cab cut across the lane of oncoming traffic and came to rest on the curb.

Johnson testified that as he slowly passed the cab he saw a man, who he later identified as appellant, in the back seat with a gun in his right hand. He appeared to be looking over the front seat and mov-

ing his left hand around in the front seat. Johnson also noticed that Oakley appeared slumped over in the front seat with his head toward the right front passenger door. Circling the block, he returned in approximately forty-five seconds to see appellant running away from the cab with a gun in his hand.

After watching appellant flee, Johnson proceeded a few blocks to where he saw a group of people sitting on the porch of a house and asked them to call the police and report a shooting. They declined to call but allowed him to use their phone to call the police, however, he never made the call because as he approached the house he saw appellant walking down the street. When he pointed out appellant to the group on the porch, Johnson was informed that appellant may be heading for that house because he was known by the occupants. Johnson backed away from the house, passing within one car length of appellant, and returned to his van.

Johnson then returned to the cab where he opened the cab door and used its radio to call for help. At this time, he observed that the left front pants pocket of the decedent was turned inside out. He spoke with Walker over the cab radio and apprised her of the situation. Walker then called an ambulance. Johnson then flagged down Houston Police Officers Carradero and Bertolini who were driving down Sampson Street on routine patrol. The officers proceeded to call for other units and began to cordon the area.

Sergeants G.L. Dollins and Chris Anderson, H.P.D. Homicide Division, arrived at the crime scene at approximately 4:40 p.m. A search of decedent revealed that his shirt pocket contained a pipe tool, the kind used by pipe smokers, and a lighter. The right front pants pocket had a set of keys and the left front pants pocket was turned inside out. The right rear pants pocket was empty and the left rear pants pocket contained a wallet with no cash or credit cards. Sergeant Dollins testified that decedent was wearing a wrist watch and two rings that he was unable to remove.

During the course of the investigation, H.P.D. was given the name of a possible suspect, appellant Jerome Butler, by the persons sitting on the porch where Johnson stopped to use the phone. Officer Carradero used a computer to match appellant's name to an address, and later that evening, just after 8:00 p.m. on June 17, 1986, he and his partner observed appellant standing outside that address, at 3835 Arbor Street. They approached appellant and upon inquiring they learned that his name was Jerome Butler. When the officers learned the identity of appellant, they placed him under arrest for capital murder.

Sergeant Anderson and H.P.D. crime scene investigator Mark Walicki were called to the scene of appellant's arrest. Upon receiving written consent from Ms. Marshall, owner of 3835 Arbor Street, they conducted an evidentiary search of the premises. The officers recovered two pistols and a box of ammunition from Marshall's bedroom. One of the weapons was positively identified as the alleged murder weapon.

During the course of this search, appellant, who rented a separate room in the house, was transported to the police station. While at the police station, appellant phoned Marshall and after the conversation she went to his room and returned with a plastic cup containing money and asked the officers, "Do you want Jerome's money?" The cup contained a single one hundred dollar bill and an undetermined amount of change that the officers had missed on their initial search of appellant's room. The officers took the money suggesting that they may examine it for fingerprints.

Robbie Chandler Oakley, wife of the decedent, testified that her husband was still home when she left for work, at 7:10 a.m., on the day of his murder. Oakley testified at trial she was in need of money on that day, so she went through the pockets of his shirt and pants. She removed thirty-five dollars from his pants pockets. She testified as follows:

Well, I needed some change, some small change and I went in his pockets and in his left pocket he had four one-hundred

dollar bills and some twenties. In his shirt pocket, he had some small bills like ones and a few fives that he made his change from while driving cab [sic]. And then in his left [sic] pocket of his pants he had maybe a hundred dollars or so in twenties, tens and a few fives. She further testified that the reason he had this much money on him was he had cashed a check on Monday.

Officer M.W. Williams, a crime scene investigator, was asked to perform a trace metal test on appellant's hands at 9:30 p.m. on June 17, 1986. This occurred five and one half hours after the alleged murder. He testified that the test was negative for appellant's left hand, however, the test revealed a pattern on a small portion of his right palm, the tips of his ring and middle fingers, and the base of his index finger. With the preceding litany of facts in mind, we may now apply them to the appropriate standard of review to determine if there was sufficient evidence to sustain appellant's conviction for capital murder.

It is the duty of the State to prove each and every element of the crime beyond a reasonable doubt. Beyond a reasonable doubt is a bulwark of our criminal jurisprudence. As the United States Supreme Court stated, leaving no uncertainty as to the significance of this proposition:

> Lest there remain any doubt about the constitutional stature of the reasonable doubt standard, we explicitly hold that the Due Process Clause protects the accused (sic) against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged.

*In re Winship*, 397 U.S. 358, 364, 90 S.Ct. 1068, 1072, 25 L.Ed.2d 368 (1970).

Historically, the United States Supreme Court has held that criminal convictions could not be sustained under a sufficiency of evidence analysis if there was "no evidence." The concept of a no evidence rule was enunciated in *Thompson v. Louisville*, 362 U.S. 199, 199, 80 S.Ct. 624, 625, 4 L.Ed.2d 654 (1960):

> The ultimate question presented to us is whether the charges against petitioner were so totally devoid of evidentiary support as to render his conviction unconstitutional under the Due Process Clause of the Fourteenth Amendment. Decision of this question turns not on the sufficiency of the evidence, but on whether this conviction rests upon *any evidence* at all. (emphasis added)

The focal point, at one time, was to determine whether there was any, or in the alternative "no evidence," to support the conviction. The constitutional import was to find a due process violation only where there was no evidence but the jury still rendered a guilty verdict.

With these two ideas, due process and the no evidence standard, juxtaposed, the Supreme Court was set to reconsider the standard of review for determining just what is sufficient evidence to prove all the elements of a crime beyond a reasonable doubt. In establishing this standard of review, the Court in *Jackson v. Virginia*, 443 U.S. 307, 316, 99 S.Ct. 2781, 2787, 61 L.Ed.2d 560 (1979), reaffirmed *Winship* and its precedential value when it wrote:

> In short, *Winship* presupposes as an essential of the due process guaranteed by the Fourteenth Amendment that no person shall be made to suffer the onus of a criminal conviction except upon sufficient proof—defined as evidence necessary to convince a trier of fact beyond a reasonable doubt of the existence of every element of the offense.

*Id.* The problem arises, however, as to just how much evidence was required to convict the defendant when *Winship* mandated that due process of law required "sufficient proof" to meet the burden of beyond a reasonable doubt. As Justice Stewart noted, certiorari had been granted in *Jackson* to consider petitioner's claim that under *In re Winship*:

> a federal habeas corpus court must consider not whether there was *any* evidence to support a state-court conviction, but whether there was sufficient evidence to justify a rational trier of the facts to find guilt beyond a reasonable doubt.

*Id.*, 443 U.S. at 312–313, 99 S.Ct. at 2785–86. Accordingly, the stage was set to reassess the *Thompson* "no evidence" standard. As the Court opined:

That the *Thompson* 'no evidence' rule is simply inadequate to protect against misapplications of the constitutional standard of reasonable doubt is readily apparent. '[A] mere modicum of evidence may satisfy a 'no evidence' standard ...' *Jacobellis v. Ohio*, 378 U.S. 184, 202, 84 S.Ct. 1676, 1686, 12 L.Ed.2d 793 [1964] ... (Warren, C.J., dissenting). Any evidence that is relevant—that has any tendency to make the existence of an element of a crime slightly more probable than it would be without the evidence, cf. Fed.Rule Evid. 401—could be deemed a 'mere modicum.' But it could not seriously be argued that such a 'modicum' of evidence could by itself rationally support a conviction beyond a reasonable doubt. The *Thompson* doctrine simply fails to supply a workable or even predictable standard for determining whether the due process command of *Winship* has been honored.

*Id.*, 443 U.S. at 320, 99 S.Ct. at 2789.

What then is the status of a standard for review for sufficient evidence to convict beyond a reasonable doubt? The preceding quote is usually forgotten when looking at the standard enunciated in *Jackson* because this quotation follows the now all to familiar quoted standard, "[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the

crime beyond a reasonable doubt." *Id.*, 443 U.S. at 319, 99 S.Ct. at 2789. As *Jackson* propagates, this standard requires that upon review by an appellate court "all the evidence is to be considered in the light most favorable to the prosecution." *Id.*

The Texas Court of Criminal Appeals has often elaborated upon the *Jackson* standard for sufficiency of the evidence reviews in this state. See *Carlsen v. State*, 654 S.W.2d 444, 448–449 (Tex.Cr.App.1983) (Opinion on Reh'g) and *Moreno v. State*, 755 S.W.2d 866, 867 (Tex.Cr.App.1988). *Carlsen* points out,

that circumstantial evidence should not be tested by an ultimate 'standard for review' different from direct evidence; the standard in both kinds of cases is whether 'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' (citation omitted)

*Id.*, 654 S.W.2d at 449. It is apparent, then, that circumstantial evidence cases have no different standard of review than those cases supported by direct evidence.[1] See also, *McGoldrick v. State*, 682 S.W.2d 573, 577 (Tex.Cr.App.1985). In *Moreno*, this Court attempted to "explicate" the standard as set forth in *Jackson*, supra, however, the mere recapitulation of the same familiar quote lends little to its explanation. The problem is compounded, as Judge Clinton points out in his concurring opinion, when the Court errs in citing *Combs v. State*, 643 S.W.2d 709 (Tex.Cr. App.1982) in support of the *Jackson* standard of review for sufficiency of the evidence. See also Judge Teague's dissent in

---

1. Implicit in this statement is a question concerning the status of the reasonable hypothesis theory. We reiterate:

   [W]e are unable to devise or discover any reason, ...., for abandoning the utilitarian 'exclusion of outstanding reasonable hypotheses' analysis for applying the above 'standard for review' [*Jackson*] in circumstantial evidence cases. By the nature of circumstantial evidence, in order to determine it rationally establishes guilt beyond a reasonable doubt, a process of elimination must be used.... Stated in the converse, if the evidence supports an inference other than the guilt of the appellant, a finding of guilt beyond a reasonable doubt is not a rational finding.

*Carlsen*, 654 S.W.2d at 449. We recognize that the United States Supreme Court declined, in *Jackson*, to adopt this theory as part of the *Jackson* standard for review. Likewise, we do not mean to imply an adoption of this theory as the standard of review for sufficiency of the evidence. The reasonable hypothesis theory as utilized by this Court is merely an analytical construct to facilitate the application of the *Jackson* standard.

In this vein we incorporate and adopt the comments of our brother Clinton in his concurring opinion.

*Gold v. State,* 736 S.W.2d 685, 691 (Tex.Cr. App.1987).

In *Combs,* we stated that when reviewing sufficiency claims this Court would follow the standard set out in *Banks v. State,* 510 S.W.2d 592, 595 (Tex.Cr.App.1974) (emphasis added):

> In reviewing the sufficiency of the evidence to support the conviction, we must view the evidence in the light most favorable to the verdict. In doing so, the verdict will be sustained if there is *any evidence* which, if believed, shows the guilt of the accused.

*Combs,* 643 S.W.2d at 716. As Judge Teague observed in *Gold:*

> This standard is unquestionably a 'no evidence' rule, and differs not at all from the standard approved by the United States Supreme Court in *Thompson ...*
>
> The problem, of course, is that the *Thompson* 'no evidence' criterion was expressly abandoned by the Supreme Court in *Jackson....*

*Id.,* 736 S.W.2d at 692, (Teague, J. dissenting). Therein lies the discrepancy. The majority in *Combs,* reiterated the *Jackson* sufficiency standard while directly quoting from *Banks,* a pre-*Jackson* case, that relies on the *Thompson* no evidence standard by looking for *any* evidence to affirm the conviction. The irony is the *Combs* decision was a full three years after that standard had been "expressly abandoned." See *Moreno,* 755 S.W.2d at 870–872. (Clinton, J. concurring). As Judge Teague opined in his dissent, "Historically, the Texas Court of Criminal Appeals has always used the 'no evidence' standard to review evidentiary sufficiency. The fact that we continue to do so after *Jackson* is puzzling." *Gold,* 736 S.W.2d at 697.

■ Adherence to the no evidence standard is now, and has been for the last decade, expressly forbidden by *Jackson.* It is no longer permissible to merely quote the *Jackson* standard and then to turn around and apply the *Thompson* no evidence standard as we have historically done. Therefore, we expressly overrule that part of *Combs,* that relied upon the no evidence language quoted from *Banks,* to denote the incorrect standard of review for sufficiency of the evidence three years after *Jackson.* To recapitulate, the test as delineated in *Jackson* requires us, as the reviewing court, to determine whether "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson,* 443 U.S. at 319, 99 S.Ct. at 2789.

■ We must take each case and review the entire body of evidence to determine whether the State has proven beyond a reasonable doubt each and every element of the alleged crime and not just a plausible explanation of the crime. We turn, then, to this case to ascertain if the State proved beyond a reasonable doubt the act of robbery or attempted robbery during the commission of a murder.[2]

Appellant argues, using a series of cases from this Court, that since he made no admissions or confessions, there was no accomplice witness testimony, he was not found in possession of provable property belonging to the victim, and the decedent made no dying declaration the State failed to prove robbery or an attempted robbery beyond a reasonable doubt. The State, however, aptly demonstrates, at a minimum, there was an attempted robbery.

As the State points out in its brief, the appellant's intent to steal can be inferred from a series of facts: the appellant called for a cab only two blocks from his residence; he had in his possession a loaded .38 revolver at the time he entered the cab; he executed the cab driver; he reached over the front seat and did something with his left hand; and, he fled from the scene of the crime. "A verbal demand is not the talisman of an intent to steal. Such intent may be inferred from actions or conduct." *Johnson v. State,* 541 S.W.2d 185, 187 (Tex.

---

2. There is no challenge to the sufficiency of the evidence concerning the commission of the murder.

Cr.App.1976). See also, *Fierro v. State*, 706 S.W.2d 310, 313 (Tex.Cr.App.1986).

The fact there is no proof appellant was in possession of decedent's property nor that appellant was actually successful in stealing from the decedent is irrelevant. The evidence is sufficient to establish an attempted robbery thereby satisfying the capital murder statute.[3] The evidence demonstrated that one of decedent's pants pockets was found turned inside out. Also, there was no cash found on the decedent an interesting anomaly considering the fact he was a cab driver and had been on duty all day. Further, his wife had testified to the fact that in the morning the decedent had been in possession of at least four one hundred dollar bills. Even if the decedent had been without any money, the fact that his pocket had been rifled, as the state asserts, coupled with the fact that it is an "unlikely supposition" there exists "a motive-less killer," *O'Pry v. State*, 642 S.W.2d 748, 761 (Tex.Cr.App.1982) (Opinion on Reh'g), proves beyond a reasonable doubt that, at a minimum, an attempted robbery did occur.

The evidence, then, consists of the following facts: appellant entered a cab with a loaded .38 revolver only two blocks from his residence; he executed the cab driver; and he reached over the front seat and ransacked the pants pocket of the decedent. These facts, as viewed in the light most favorable to the verdict, are sufficient for a rational trier of fact to have concluded beyond a reasonable doubt that appellant intentionally committed the murder of Nathan Oakley while in the course of committing or attempting to commit the robbery of the decedent. See *Burks v. State*, 693 S.W.2d 932, 937 (Tex.Cr.App.1985). Therefore, point of error number one is overruled.

3. Tex.Penal Code 19.03 (1974) states:
  (a) A person commits an offense if he commits murder as defined under section 19.02(a)(1) of this code and:
    *   *   *   *   *   *
  (2) the person intentionally commits the murder in the course of committing or *attempting* to commit kidnapping, burglary, *robbery*, aggravated sexual assault, or arson.... (emphasis added)

Appellant argues, in his second point of error, since there does not appear a seal, pursuant to Rule 902(1) of the Texas Rules of Criminal Evidence, from the state of New York on the front of the New York penitentiary packet its admission at the penalty phase was improper. Texas Rule of Criminal Evidence Rule 902(1)[4] permits the admission of public documents "bearing a seal purporting to be that of the United States, or any state ... department, officer, or agency thereof, and a signature purporting to be an attestation or execution." We have reviewed the record which consists of an affidavit from Inmate Record Coordinator of Green Haven Correctional Facility in Stormville, New York, and determined that embossed on that affidavit is a seal of the correctional facility, a department or agency in the state of New York. Therefore, we overrule appellant's point of error number two.

■ Appellant argues in point of error number three that testimony from Sgt. Anderson was improperly admitted concerning the residence of appellant. The record reflects the following exchange:

[PROSECUTOR]: Sergeant Anderson, showing you what has been marked and admitted into evidence as State's Exhibit No. 21. What is that a photograph of?

[SGT. ANDERSON]: The front door of 3835 Arbor where the suspect and Mrs. Marshall lived.

[DEFENSE COUNSEL]: Objection. Conclusion on his part as to who lived there.

Appellant asserts that this testimony was objectionable because Sgt. Anderson had no personal knowledge of appellant's residence and that his conclusory statement was based on hearsay information. In appellant's fifth point of error, he asserts

4. Appellant suggests that because he saw no seal from the state of New York on the packet, then, Rule 902(2) is applicable. Due to the fact a seal, albeit not completely legible, from the Green Haven Correctional Facility appears on the affidavit appellant's assertion as to its nonexistence under Rule 902(2) is incorrect.

that trial court was in error for not granting a mistrial, when it was properly requested, for the following question:

> [PROSECUTOR]: With regard to searching the Arbor Street house, first off, with regard to talking to Mrs. Marshall, did you ascertain that the defendant Jerome Butler also lived there?
>
> [SGT. ANDERSON]: Yes, sir.
>
> [DEFENSE COUNSEL]: I'll object to that, judge, as calling for an answer based on hearsay.
>
> [COURT]: Sustained.

The subsequent motion for mistrial was overruled.

Although it is arguable that the evidence introduced at trial was predicated on hearsay testimony, "it is well settled that an error in admission of evidence is cured where the same evidence comes in elsewhere without objection; defense counsel must object every time allegedly inadmissible evidence is offered." *Hudson v. State*, 675 S.W.2d 507, 511 (Tex.Cr.App.1984). See also *Womble v. State*, 618 S.W.2d 59, 62 (Tex.Cr.App.1981), cf. *Crocker v. State*, 573 S.W.2d 190, 201 (Tex.Cr.App.1978). In the instant case, the information objected to by the defense counsel had already been introduced, without objection, by Sgt. Anderson just prior to this objection. Sgt. Anderson testified as follows:

> [PROSECUTOR]: Sergeant Anderson, I believe we stopped off at the point that you arrived at the Arbor Street address and the defendant Jerome Butler had already been placed in custody; is that correct?
>
> [SGT. ANDERSON]: That is correct.
>
> [PROSECUTOR]: Did you have occasion to talk to anbody else that lived at the house?
>
> [SGT. ANDERSON]: Yes, I talked to Mrs. Marshall, the owner of the house where he lives.

In addition, during an earlier cross-examination of Officer Carradero the following exchange occurred:

> [DEFENSE COUNSEL]: Were there any rooms within the house that were assigned to Mr. Butler in particular?

> [OFFICER CARREDERO]: I believe there was one, yes.

It is apparent that defense counsel opened the door at this point in time to all subsequent questions concerning the location of appellant's residence. Any error in admitting the testimony of Sgt. Anderson was cured by defense counsel's failure to object to the same information being admitted at other times during the trial. Therefore, no error exists and appellant's third and fifth points of error are overruled.

In point of error number four, appellant argues that the introduction of his driver's license during the guilt phase of trial, to establish his place of residence, was in error because it contained hearsay. More precisely, appellant's drivers license was introduced to establish his place of residence, as in the previous points of error as to tie him to 3835 Arbor Street where the alleged murder weapon was found, which was offered to prove the truth of the matter asserted—that appellant lived at that particular address. Even if we agree that the introduction of the driver's license was error, such error was harmless. As stated in the prior two points of error, the fact appellant lived in the house where the alleged murder weapon was found had already been introduced on two prior unobjected occasions. See *Hudson*. Appellant's fourth point of error is overruled.

■ Appellant's sixth, and final, point of error claims the trial court erred in failing to grant a mistrial when one of the arresting officers stated that it was his opinion appellant was the person observed by Johnson at the scene of the crime. The record reflects that on direct examination of Officer Carradero the state elicited the following testimony:

> [PROSECUTOR]: When you got to the address there on Scott Street that came back on the driver's license for Jerome Butler, did you see anybody?
>
> [OFF. CARRADERO]: Yes, we did.
>
> [PROSECUTOR]: Who did you see?
>
> [OFF. CARRADERO]: We saw a description of the suspect. We saw somebody standing outside, and we looked for them, and *it was the person that was*

*described to us by Johnson earlier during the incident.*

[PROSECUTOR]: Was the description that Mr. Johnson gave you fairly accurate?

[OFF. CARRADERO]: It was very accurate, yes.

[PROSECUTOR]: Was there any doubt in your mind that the person that you were looking at in front of the house on Arbor Street was the person that Mr. Johnson described.

[OFF. CARRADERO]: No doubt.

[DEFENSE COUNSEL]: I would object to that. That is a conclusion.

[THE COURT]: Sustained. (emphasis added)

It is apparent from this colloquy that appellant waived his objection because the officer testified to the same fact, without objection a few lines before defense counsel's objection. It is axiomatic, "an objection must be timely made, i.e., at the earliest opportunity." *Stevens v. State,* 671 S.W. 2d 517, 521 (Tex.Cr.App.1984). Point of error number six is overruled.

The judgment of the trial court is affirmed.

CAMPBELL, Justice, concurring:

Since neither the appellant nor the State has requested a re-examination of the decision in *Combs,* I see no reason to overrule it. However, I believe the correct result

---

1. Pointedly we made the decision in a quartet of cases in which conviction depended on circumstantial evidence, *viz: Carlsen v. State,* 654 S.W. 2d 444, 448ff; *Freeman v. State,* 654 S.W.2d 450, at 455ff; *Denby v. State,* 654 S.W.2d 457, at 463ff; *Wilson v. State,* 654 S.W.2d 465, at 470ff (Tex.Cr.App.1983) (Opinions on Rehearing).

Forever the Court has tested sufficiency of circumstantial evidence under a rubric of "the utilitarian *'exclusion of outstanding hypotheses'* analysis," and we found no reason to abandon it for *"applying"* the *Jackson v. Virginia* standard of review in such a case. *Carlsen,* at 449; *Freeman,* at 456; *Denby,* at 464; *Wilson,* at 471; each concurring opinion agreed, 654 S.W.2d at 450, at 457, at 465 and at 472 (all emphasis is mine throughout this opinion unless otherwise indicated).

2. As Judge White sees the opinion of the Court, it "ignores the most important aspect of *Moreno [v. State,* 755 S.W.2d 866 (Tex.Cr.App.1988)]," 

---

was reached by the majority, thus I concur in its judgment.

CLINTON, Justice, concurring.

In the opinion of the Court Judge Miller reprises the "critical inquiry" the Supreme Court held a *federal habeas* court has a duty to make on reviewing sufficiency of evidence to support a criminal conviction obtained in a state court. Opinion, at 237–239. That is, of course, the standard of review it pronounced as "the constitutional *minimum*" in *Jackson v. Virginia,* 443 U.S. 307, at 318–319, 99 S.Ct. 2781, at 2788–2789, 61 L.Ed.2d 560 (1979). Without being compelled by the supremacy doctrine to do so, this Court chose to adopt that standard for *state appellate* courts in reviewing sufficiency of circumstantial as well as direct evidence on appeal.[1]

That we deliberately adhered to a traditional analytical formulation for examining one kind of evidence in applying a newly adopted standard of review—one the Court was not obliged to accept in the first place —was to recognize there are no better guidelines than "those we currently employ" for that purpose, e.g., *Carlsen,* at 450, and *Wilson,* at 472. We were not then and are not now being "disturbingly selective;" rather, the Court retained a large body of law, well known to bench and bar, to guide appellate review by fourteen courts of appeals. If not its duty, such is its patent prerogative.[2]

---

*viz:* "the discussion of the actual degree of evidence necessary to support the jury's verdict." Concurring opinion, at 244. The problem in *Moreno* is its admonition that "a verdict must stand unless it is found to be irrational *or* unsupported by a more than a 'mere modicum' of evidence...." *Id.,* at 867.

First of all, read literally the statement means "unless the verdict is *either* irrational *or* unsupported by more than a mere modicum of evidence." On that account alone the discussion hardly describes an "actual degree of evidence."

More importantly, the "mere modicum" term was used by the Supreme Court to point out that its "no evidence" doctrine failed to provide "a workable or even predictable standard." *Jackson v. Virginia,* supra, 443 U.S. at 320, 99 S.Ct., at 2789–2790. In making its point the Supreme Court did not there suggest that the inquiry it mandated is complete when slightly "more than a mere modicum" is found in the record evi-

We need not reject what the Supreme Court "denounces" for its own reasons of practice. Federal courts instruct the jury on meaning of reasonable doubt. *Holland v. United States,* 348 U.S. 121, 139–141, 75 S.Ct. 127, 137–138, 99 L.Ed. 150 (1954). The law of this State does not mandate that jurors be given a definition of reasonable doubt.

A majority of this Court abolished the requirement of a circumstantial evidence charge but refused to require trial courts to define reasonable doubt. *Hankins v. State,* 646 S.W.2d 191, 197ff (Tex.Cr.App. 1981) (Opinions on State's Motion for Rehearing delivered March 1, 1983). *Thereafter,* while agreeing with the State's suggestion that the "standard for appellate review" is the same for direct and circumstantial evidence cases, with *Hankins* in mind this Court maintained the "reasonable hypothesis" analysis for *applying* that standard. We agreed that "if there is a 'reasonable hypotheses' other than guilt of the accused, then it cannot be said that the guilt has been shown 'beyond a reasonable doubt.'" McCormick, J., concurring in *Carlsen,* et al., supra, delivered July 20, 1983.

Therefore, if *Moreno* "decided that any amount of evidence constituting more than a 'mere modicum' to support the jury's verdict will suffice," White, J., concurring herein, at 244, then it is *Moreno* rather than the opinion of the Court in this cause that "sees fit to selectively adhere to certain convenient aspects of *Jackson [v. Virginia], supra ...,*" *id.,* at 244.

With those observations, I join the opinion of the Court.

WHITE, Justice, concurring.

At this point in time, a decade after *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), I thought all members of this Court were well aware that the "no evidence" standard of sufficiency review was defunct. At the very least, I do know that the general members of the bar have long been aware of this fact. This is why, although I do not disagree, I do find the majority's perceived need to overrule the implicitly invalid "no evidence" language in *Combs v. State,* 643 S.W.2d 709 (Tex.Cr.App.1982), quite perplexing. Had I realized that anyone considered this language in *Combs* the least bit viable, I would have never cited *Combs* in *Moreno v. State,* 755 S.W.2d 866 (Tex. Cr.App.1988). *Moreno's* reliance on *Combs* was intended to be, albeit implicitly, purely limited to *Combs'* discussion of and quotation from *Jackson* concerning the type of sufficiency evaluation involved in a due process standard of review. *Moreno, supra* at 867. However, after reading the instant majority opinion, I now must give credence to Judge Clinton's concerns in *Moreno* that a *Combs* citation would revive the totally unacceptable "no evidence" standard. *Moreno, supra* at 872 (Clinton, J., concurring). Such was never my intent, nor, I dare say, the majority's intent in voting for *Moreno.* Thus, to the extent that the "no evidence" standard of review has once again been disavowed, I do not disagree.

---

dence. To the contrary, in note 12 it had already alluded to degrees of more substantial evidence. See, e.g., *Moreno,* supra, at 871 (Clinton, J., concurring; *Nevarez v. State,* 767 S.W.2d 766 (Tex.Cr.App.1989). (Clinton, J., dissenting).

Indeed, when it came to apply the "rational factfinder" standard of review to the contested issue of specific intent to kill, without in any way indicating its quest was for "more than a mere modicum" the Supreme Court first examined *all* germane evidence presented by the prosecution, and concluded:

"... From these uncontradicted circumstances, a rational factfinder readily could have inferred beyond a reasonable doubt that the petitioner, notwithstanding evidence that he

had been drinking on the day of the killing, did have the capacity to form and had in fact formed an intent to kill the victim."

*Id.,* 443 U.S. at 325, 99 S.Ct., at 2792. Concerning his claim of selfdefense, the Supreme Court said it was evident from the record "that the trial judge found this story, including the petitioner's belated contention that he had been so intoxicated as to be incapable of premeditation, incredible." *Ibid.* That ended its analysis of evidence, and after again rejecting a reasonable hypothesis theory the Supreme Court held a rational trier of fact could have reasonably found petitioner committed murder as alleged. *Id.,* at 326, 99 S.Ct., at 2792–2793.

What I do disagree with, however, is the less than favorable characterization of *Moreno* by the majority, many of whom fully joined the *Moreno* opinion less than eight months ago. Further, and what disturbs me even more, is that the majority ignores the most important aspect of *Moreno* —the discussion of the actual degree of evidence necessary to support the jury's verdict. Here lies the crux of any *Jackson* analysis yet the majority fails to even acknowledge this issue. In *Moreno* we stated,

> Under the *Jackson* standard, the reviewing Court is not to position itself as a thirteenth juror in assessing the evidence. Rather, it is to position itself as a final, due process safeguard ensuring only the rationality of the factfinder.... The factfinder, best positioned to consider all the evidence firsthand, viewing the valuable and significant demeanor and expression of the witness, has reached a verdict beyond a reasonable doubt. Such a verdict must stand unless it is found to be irrational or unsupported by more than a 'mere modicum' of the evidence, with such evidence being viewed under the *Jackson* light.

*Moreno, supra* at 867. Thus, this Court has decided that any amount of evidence constituting more than a "mere modicum" to support the jury's verdict will suffice.

Finally, I must point out the folly in the majority's denouncement of prior applications of *Jackson* while they themselves attempt to validate a method of sufficiency review that *Jackson* expressly disapproved. In footnote 1, the majority 'reiterates' the continued validity of the "outstanding reasonable hypothesis" theory, op. at 238. However, the *Jackson* Court explicitly rejected this notion by stating,

> Only under a theory that the prosecution was under an affirmative duty to rule out every hypothesis except that of guilt beyond a reasonable doubt could this petitioner's challenge be sustained. *That theory the Court has rejected in the past. Holland v. United States,* 348 U.S. 121, 140, 75 S.Ct. 127, 137, 99 L.Ed. 150 [ (1954) ]. *We decline to adopt it today.* Under the standard established

in this opinion as necessary to preserve the due process protection recognized in *Winship,* a federal habeas corpus court faced with a record of historical facts that supports conflicting inferences must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution.

(emphasis supplied). *Jackson, supra* 443 U.S. at 325–327, 99 S.Ct. at 2792–93. Thus, *Jackson* specifically denounces the "reasonable hypothesis theory" while the majority embraces it. Further, whether this theory is euphemistically labeled as an "analytical construct" (see op. at 238, fn. 1) or a standard of review is of little moment; the resultant effect remains the same—the adoption of a theory of sufficiency review expressly denounced by *Jackson.* Thus, although the majority, by all auspices, fully adheres to *Jackson,* it appears to me that such adherence is disturbingly selective.

Because the Court sees fit to selectively adhere to certain convenient aspects of *Jackson, supra* and *Moreno, supra,* while completely disregarding the less palatable holdings of those opinions, I must concur only in the result reached.

McCORMICK, J., joins this concurrence.