

# COURT OF APPEALS
### SECOND DISTRICT OF TEXAS
### FORT WORTH

## NO. 02-10-00017-CR

SEAN DOUGLAS TURNEY                                          APPELLANT

V.

THE STATE OF TEXAS                                               STATE

------------

FROM COUNTY CRIMINAL COURT NO. 1 OF DENTON COUNTY

------------

## MEMORANDUM OPINION[1]

----------

A jury convicted Appellant Sean Douglas Turney of family violence assault causing bodily injury. The trial court sentenced him to serve 365 days' confinement in the Denton County Jail, probated for twenty months, and to pay a fine of $500. In three issues, Appellant challenges the sufficiency of the evidence to support his conviction and the admission of evidence of a prior conviction. Because the evidence is sufficient to support his conviction and

---

[1]*See* Tex. R. App. P. 47.4.

because we hold that the trial court's error in admitting the evidence of the prior conviction was harmless, we affirm the trial court's judgment.

## I. Facts

Appellant was charged with family violence assault causing bodily injury. The information alleged that he had intentionally, knowingly, or recklessly caused bodily injury to Nicole Thomas by grabbing, pushing, or striking her with his hand; by striking her with a telephone; or by striking her with his elbow. The information also alleged that Thomas was a member of his family, a member of his household, or a person with whom he has or has had a dating relationship.

Appellant and Thomas were involved in a dating relationship. At trial, Thomas testified that on March 22, 2009, they began arguing about her moving in with him; Thomas testified that she did not want to move in with him because she was scared of him. She testified that she woke up at 2:30 in the morning and got up because she wanted to write down her thoughts. Thomas stated that Appellant became angry and asked why she was up at that time of night. She testified that he accused her of cheating on him and demanded to see her cell phone. She stated that she refused and put her phone in her back pocket. According to Thomas, Appellant came up to her "like he was going to hug [her]" and then grabbed the phone. She asked for her phone back. Thomas then testified,

> And he was blocking himself, and I was kind of reaching over. And the next thing I know, just something, either a cell phone or a hand

2

or an elbow, something hit me so hard that I had literally flown back, hit my head and my back on the carpet.

Thomas testified that Appellant went into the bathroom, and she followed him, at which point he slammed her against the wall and then tackled her. Thomas stated that she began screaming for help and banging on the wall so that a neighbor would hear. Appellant released her, and she went into the living room and headed toward the front door. Thomas testified that Appellant blocked her from heading toward the door and pushed her onto the couch. He then walked back toward the bathroom.

When Appellant walked into the bathroom, Thomas stated, she grabbed "as much stuff as [she] possibly could," ran outside to a friend's apartment in the same complex, and knocked on the door. No one answered, and no one answered when she knocked on another neighbor's door. Thomas testified that she then realized that she did not have her keys or her phone, so she returned to the apartment. According to Thomas, Appellant "was just kind of standing there looking at [her] like nothing had really happened." Her keys and her phone were on the coffee table, so she took them and left. Appellant did not try to stop her. Thomas testified that she went to her car and slept for a while, and then, after driving around "for a little bit," drove to the police station and reported what had happened. She could not remember how long she had slept, but she arrived at the police station by 7:00 a.m.

Officer Terry Farmer of The Colony Police Department testified that on March 23, 2009, Thomas came into the police station and reported that Appellant had assaulted her. Farmer observed a small, red bump, roughly the size of a silver dollar, on Thomas's head.

Appellant testified that he had woken up in the middle of the night and heard a cell phone ringing from the living room. He said that he went to the living room and picked up the phone. He stated that Thomas walked up and told him that it was her phone. He testified that he scrolled through it for a couple of minutes and then gave it back to her. According to Appellant, he and Thomas then sat down and talked for about twenty or twenty-five minutes and decided that they should break up. He stated that she left and then returned about forty-five minutes later. Appellant testified that Thomas told him that she had nowhere else to stay that night and asked if she could stay until he had to leave for work in the morning. He said that he had agreed and that she had stayed until he woke up at about 6:00 a.m.

Appellant testified that he wanted to break up with Thomas because he was worried about her medical condition. He "thought her seeing [him] was stressing her out in a way where she was getting up in the middle of the night, writing down crazy things."

On cross-examination, the State asked Appellant for impeachment purposes about his previous out-of-state conviction for domestic battery. Appellant's attorney objected, and the trial court overruled the objection.

4

## II. Sufficiency of the Evidence

In his first two issues, Appellant contends that the evidence is legally and factually insufficient to support his conviction. But since this case was submitted, the Texas Court of Criminal Appeals has held that there is no meaningful distinction between the legal sufficiency standard and the factual sufficiency standard.[2] Thus, the *Jackson* standard, which is explained below, is the "only standard that a reviewing court should apply in determining whether the evidence is sufficient to support each element of a criminal offense that the State is required to prove beyond a reasonable doubt."[3]

The sufficiency of the evidence in a criminal case is not determined by a no-evidence standard.[4] Instead, in our due-process review of the sufficiency of the evidence to support a conviction, we view all of the evidence in the light most favorable to the prosecution to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.[5] The

---

[2]*Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010) (overruling *Clewis v. State*, 922 S.W.2d 126, 131–32 (Tex. Crim. App. 1996)).

[3]*Id.*

[4]*Butler v. State*, 769 S.W.2d 234, 239 (Tex. Crim. App. 1989), *overruled on other grounds by Geesa v. State,* 820 S.W.2d 154, 161 (Tex. Crim. App. 1991), *overruled on other grounds by Paulson v. State,* 28 S.W.3d 570, 571 (Tex. Crim. App. 2000).

[5]*Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007).

jury is the sole judge of the credibility of the evidence and the weight to be given to each piece of evidence.[6]

Appellant admitted that he and Thomas had met at a bar on New Year's Eve and that she had begun staying with him in his apartment that night. She would spend five out of seven nights a week with him. He testified that he had suggested that she live with him full time after they had dated about a month and a half. He thought that she had agreed and was living with him. He testified that he was not sure what she did for a living but that she had mentioned modeling. Appellant became concerned when he saw several medicine bottles in Thomas's purse. He had never seen that many. The drugs included Klonopin, Vicodin, Adderall, and several others with "weird names" that he had never seen or heard of.

Both Appellant and Thomas agreed that they had lived together for about three months. After about a month, she began leaving the apartment in the early morning hours and then returning after several hours. Appellant testified that he decided to end the relationship and had told her of his decision on the same day that she alleged was the day that he had assaulted her.

Appellant testified that Thomas's ringing telephone woke him up, and he picked it up and scrolled through it. He said that they mutually agreed to end the relationship, and Thomas left. About forty-five minutes later, she came back and

---

[6]*Brooks*, 323 S.W.3d at 899.

6

said that she had no place to go. He let her back in, and she stayed until he had to get up for work. About two weeks later, the police came to his door.

Appellant denied that any assault occurred and denied that Thomas had ever told him that she was accusing him of assault.

Thomas, on the other hand, described the relationship as rocky and filled with emotional, but not physical, abuse. Thomas testified that she had gotten up to write down her thoughts the same night that Appellant claimed her ringing phone had awakened him. She described Appellant as irate and stern because he thought she had been cheating on him. He took her phone, and when she politely asked him to please return the phone, he hit her, although she was not sure whether he used his hand or the phone to hit her. Then he slammed her down and tackled her, and she screamed, left, and pounded on a neighbor's door. When she realized that she did not have her keys or her telephone, she went back to Appellant's apartment, got her keys and phone, and spent the rest of the night in her car. She did not call the police at that time.

The jury heard the testimony of Appellant and Thomas. The jury also saw the photographs of Thomas and heard testimony from the police. The case was essentially a swearing match, but there was evidence of a small red mark on Thomas's head, and the police testified that she was upset and had disheveled hair when she reported the assault. Applying the appropriate standard of review, we cannot say, under the law, that the evidence was insufficient to support the jury's verdict. We therefore overrule Appellant's first two issues.

7

## III. Admissibility of Prior Conviction

In his third issue, Appellant argues that the trial court reversibly erred by admitting evidence of a prior family violence conviction. The State concedes error under rule 609[7] but argues that it is harmless. We agree.

At trial, Appellant testified that he had satisfactorily completed the period of probation for domestic violence assessed upon his guilty plea in the prior case. He testified that, because he had successfully completed the period of probation, he was discharged from probation and the offense was expunged from his record.

Rule 609 permits admission of evidence of conviction of certain offenses for purposes of impeachment of a witness.[8] But, among the limits on the admissibility of prior convictions, subsection (c)(2) provides that

> [e]vidence of a conviction is not admissible under this rule if . . . probation has been satisfactorily completed for the crime for which the person was convicted, and that person has not been convicted of a subsequent crime which was classified as a felony or involved moral turpitude, regardless of punishment.[9]

As the State candidly concedes, the trial court erred under rule 609(c)(2) by admitting evidence of Appellant's prior domestic violence conviction. Generally, the erroneous admission or exclusion of evidence is nonconstitutional

---

[7]*See* Tex. R. Evid. 609(a), (c)(2).

[8]*Id.*

[9] Tex. R. Evid. 609(c)(2).

error governed by rule 44.2(b) if the trial court's ruling merely offends the rules of evidence.[10]  Under rule 44.2(b), we are to disregard the error if it did not affect Appellant's substantial rights.[11]  A substantial right is affected when the error had a substantial and injurious effect or influence in determining the jury's verdict.[12]  Conversely, an error does not affect a substantial right if we have "fair assurance that the error did not influence the jury, or had but a slight effect."[13]  In making this determination, we review the record as a whole, including any testimony or physical evidence admitted for the jury's consideration, the nature of the evidence supporting the verdict, and the character of the alleged error and how it might be considered in connection with other evidence in the case.[14]  We may also consider the jury instructions, the State's theory and any defensive theories, whether the State emphasized the error, closing arguments, and even voir dire, if applicable.[15]

---

[10]*See Solomon v. State*, 49 S.W.3d 356, 365 (Tex. Crim. App. 2001).

[11]Tex. R. App. P. 44.2(b); *see Mosley v. State*, 983 S.W.2d 249, 259 (Tex. Crim. App. 1998) (op. on reh'g), *cert. denied*, 526 U.S. 1070 (1999); *Coggeshall v. State*, 961 S.W.2d 639, 642–43 (Tex. App.—Fort Worth 1998, pet. ref'd).

[12]*King v. State*, 953 S.W.2d 266, 271 (Tex. Crim. App. 1997) (citing *Kotteakos v. United States*, 328 U.S. 750, 776, 66 S. Ct. 1239, 1253 (1946)); *Coggeshall*, 961 S.W.2d at 643.

[13]*Solomon*, 49 S.W.3d at 365; *Johnson v. State*, 967 S.W.2d 410, 417 (Tex. Crim. App. 1998).

[14]*Motilla v. State*, 78 S.W.3d 352, 355 (Tex. Crim. App. 2002).

[15]*Id.* at 355–56.

The record contains sufficient evidence of guilt of the offense in this case, the jury charge contains a proper limiting instruction regarding the jury's consideration of extraneous offenses, the State spent very little time on the improper evidence and did not delve into its details, and finally, the trial court probated Appellant's sentence. We therefore cannot say that the trial court's error contributed either to Appellant's conviction or to a higher punishment. We hold that the trial court's error was harmless beyond a reasonable doubt and overrule Appellant's third issue.

## IV. Conclusion

Having overruled Appellant's three issues, we affirm the trial court's judgment.

LEE ANN DAUPHINOT
JUSTICE

PANEL: LIVINGSTON, C.J.; DAUPHINOT and MCCOY, JJ.

DO NOT PUBLISH
Tex. R. App. P. 47.2(b)

DELIVERED: August 11, 2011